**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

TERESA SCHOONOVER,

   Plaintiff,

vs.

ADM CORN PROCESSING, a Division
of ARCHER DANIELS MIDLAND
COMPANY,

   Defendant.

No. 06-CV-133-LRR

**ORDER**

_____

### *TABLE OF CONTENTS*

*I.*   *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*   *RELEVANT PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . *2*

*III.*   *CONSTRUCTION OF THE COMPLAINT* . . . . . . . . . . . . . . . . . . . . . *2*
   *A.*   *FMLA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
   *B.*   *Instant Case* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
   *C.*   *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

*IV.*   *STANDARD FOR SUMMARY JUDGMENT* . . . . . . . . . . . . . . . . . . . . *7*

*V.*   *SUMMARY JUDGMENT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . *8*
   *A.*   *Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
   *B.*   *Policy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
   *C.*   *ADM Hires Schoonover* . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
   *D.*   *Early Formal and Informal Discipline* . . . . . . . . . . . . . . . . . *10*
   *E.*   *Plan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*
   *F.*   *Revised Plan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*
   *G.*   *Late 2003 and Early 2004 Absences* . . . . . . . . . . . . . . . . . . *15*
   *H.*   *2004 Last Chance Agreement* . . . . . . . . . . . . . . . . . . . . . . *16*
   *I.*   *Final Plan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*
   *J.*   *Digestive Problems* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *18*
   *K.*   *Stepfather's Heart Attack* . . . . . . . . . . . . . . . . . . . . . . . . *21*
   *L.*   *Termination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *23*

VI.    **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

      A.    *Elements of Schoonover's Two Claims* . . . . . . . . . . . . . . . . . . . **25**
      B.    *Was Schoonover Entitled to FMLA leave?* . . . . . . . . . . . . . . . . **26**
          1.    *Digestive problems* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**
          2.    *Stepfather's heart attack* . . . . . . . . . . . . . . . . . . . . . . **30**
      C.    *Did Schoonover Give ADM Notice of Her Intent*
           *to Take FMLA Leave?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

VII.  **DISPOSITION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

## I.  INTRODUCTION

The matter before the court is the Motion for Summary Judgment ("Motion") (docket no. 14), which was filed by Defendant ADM Corn Processing, a Division of Archer Daniels Midland Company ("ADM").

## II.  RELEVANT PROCEDURAL BACKGROUND

On September 29, 2006, Plaintiff Teresa Schoonover ("Schoonover") filed a Complaint and Jury Demand ("Complaint") against ADM. Schoonover alleges that ADM, her former employer, repeatedly violated the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*, when it denied her FMLA leave and then terminated her on the basis of FMLA-protected absences.

On December 1, 2006, ADM filed an Answer, in which it denies the substance of the Complaint.

On November 13, 2007, ADM filed the Motion. On December 5, 2007, Schoonover filed a Resistance. On December 18, 2007, ADM filed a Reply.

On January 31, 2008, the court held a hearing on the Motion. Attorney Amy L. Reasner represented Schoonover. Attorney Timothy A. Wolfe represented ADM. The Motion is fully submitted and ready for decision.

## III.  CONSTRUCTION OF THE COMPLAINT

Before the court addresses the merits of the Motion, it must determine the claims

of the Complaint. Some background on the FMLA is necessary to construe the Complaint, because the Complaint is not a model of clarity and does not contain any formal counts. Rather, the Complaint states, in part:

**"VIOLATION OF FMLA 29 U.S.C. § 2615"**

18. [ADM] interfered with [Schoonover's] substantive rights by denying the exercise or attempt to exercise her rights under FMLA.

19. [ADM] discriminated against [Schoonover] because she exercised or attempted to exercise her FMLA rights.

20. [ADM]'s actions were wilful under 29 [U.S.C. §] 2617(c)(2) and [29 C.F.R. §] 825.400(b) [(2005)].

21. [Schoonover] has been damaged as a direct and proximate result of [ADM]'s acts and omissions.

Complaint at 3 (emphasis in original).

### *A. FMLA*

"The FMLA was enacted in the wake of increasing struggle between work and family life," *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 676 (8th Cir. 2001), and it "provides job security to employees who must miss work because of their own illnesses, to care for family members, or to care for new babies," *Stallings v. Hussman Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (citing 29 U.S.C. § 2612(a)(1)(A)-(D)). "To help ease the growing tension between work and family, the FMLA establishes a right to unpaid family and medical leave for [eligible] employees . . . ." *Hatchett*, 251 F.3d at 676. Specifically, "[t]he FMLA provides eligible employees up to 12 work-weeks of unpaid leave during any 12-month period." *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002) (citing 29 U.S.C. § 2612). "An employee must provide notice to an employer that [she] plans to take FMLA leave." *Stallings*, 447 F.3d at 1050 (citing 29 U.S.C. § 2612(e)(2)).

Section 2615 lists certain prohibited acts under the FMLA.  In its entirety, § 2615 provides:

### § 2615. Prohibited acts

**(a) Interference with rights**

**(1) Exercise of rights**

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

**(2) Discrimination**

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

**(b) Interference with proceedings or inquiries**

It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual—

**(1)** has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;

**(2)** has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or

**(3)** has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

29 U.S.C. § 2615 (emphasis in original).  The FMLA provides eligible employees with

a private right of action against employers who engage in these prohibited acts. *Id.*
§ 2617(a)(2).

When employees sue their employers for alleged violations of the FMLA, they most
commonly invoke § 2615(a)(1) and/or § 2615(a)(2). *See Stallings*, 447 F.3d at 1050
(stating that "[t]wo types of claims exist under the FMLA"). As the Eighth Circuit Court
of Appeals recently summarized:

> Two types of claims exist under the FMLA: (1) "interference"
> or "(a)(1)" claims in which the employee alleges that an
> employer denied or interfered with his substantive rights under
> the FMLA and (2) "retaliation" or "(a)(2)" claims in which the
> employee alleges that the employer discriminated against him
> for exercising his FMLA rights. 29 U.S.C. § 2615(a)(1)-(2).
> . . .[1]

> Confusion often arises as to whether an employee's FMLA
> claim "is really about interference with his substantive rights,
> not discrimination or retaliation." *Kauffman v. Fed. Express
> Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). The difference
> between the two claims is that the interference claim merely
> requires proof that the employer denied the employee his
> entitlements under the FMLA, while the retaliation claim
> requires proof of retaliatory intent. *Id.* "Although in some
> circumstances, a given set of facts will fall clearly into either
> (a)(1) or (a)(2), it appears that the lines between the two
> categories are not hard and fast." *Dillaway v. Ferrante*, No.
> Cir. 02-715 (JRT/JSM), [2003] WL 23109696, at *5 (D.
> Minn. Dec. 9, 2003) (unpublished).

*Id.* at 1050-51.

## B. Instant Case

Schoonover alleges violations of § 2615 but does not specify the subsection or

---

[1] Sometimes the Eighth Circuit Court of Appeals refers to a violation of
§ 2615(a)(2) as a "discrimination" claim. *Throneberry v. McGehee Desha County Hosp.*,
403 F.3d 972, 977 (8th Cir. 2005).

subsections upon which she bases her claims. In other words, Schoonover does not explicitly state whether she is pursuing an interference claim, a retaliation claim or both.

Under our notice-pleading system, Schoonover was required to make "a short and plain statement of the claim showing that [she] is entitled to relief." Fed. R. Civ. P. 8(a)(2). Schoonover needed to give ADM "'fair notice of what [her] claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007)). All "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). The function of this "low standard" is merely to "give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1056-57 (8th Cir. 2004). A mere "blanket assertion" of entitlement to relief is plainly insufficient, however. *Twombly*, 127 S. Ct. at 1965 n.3.

The court holds that Schoonover's Complaint gave ADM fair notice of both an interference claim and a retaliation claim and states the grounds upon which such claims rest. Fed. R. Civ. P. 8(a)(2). Schoonover alleges that "ADM refused to recognize . . . leave taken as protected under the FMLA," Complaint at 3, and "included protected FMLA absences as a basis for [her] termination," *id*. at 2. Paragraph 18 of the Complaint tracks the language of § 2615(a)(1). Paragraph 19 tracks the language of § 2615(a)(2). Further, ADM states that Schoonover "pleads both theories of recovery," Brief in Support of Motion (docket no. 14-2), at 15, a characterization that Schoonover does not contest. *Cf. Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007) (construing a complaint to plead both an interference theory of recovery and a discrimination theory of recovery).

### C. Conclusion

Accordingly, the court shall analyze the merits of the Motion on the premise that Schoonover is advancing both an interference claim under § 2615(a)(1) and a

discrimination claim under § 2615(a)(2). The court now turns to merits of the Motion.

## IV. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Id.* The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.,* 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss,* 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Baum v. Helget Gas Prods., Inc.,* 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.,* 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.,* 318 F.3d 803, 809 (8th Cir. 2003)).

## V. SUMMARY JUDGMENT FACTS

When viewed in the light most favorable to Schoonover and affording her all reasonable inferences, the facts are these:

### A. Players

Schoonover was born in 1966 and lives in Cedar Rapids, Iowa. She is a high school graduate and a former member of the United States Army Reserve.

ADM operates a corn processing plant ("Plant") in Cedar Rapids. The Plant operates every hour of every week. The Plant has a number of departments, including a feedhouse and a refinery. ADM employs approximately 230 people at the Plant.

At all relevant times, Doug Brakhahn was Plant Manager; Keith Klostermann was Plant Superintendent; Jeff Merrell was Feedhouse Superintendent; Doug Schroeder was Refinery Superintendent; and Maribeth Nehre was Timekeeper/Payroll Clerk.[2] Karla Christensen was Human Resources Manager until October of 2004, when Christine Helle replaced her.

### B. Policy

ADM has an attendance policy ("Policy"). In relevant part, the Policy provides:

> I. ABSENCES—ONE OR MORE DAYS
>
> An employee, unable to work his regular shift or to report on time for an overtime assignment, must call the plant at least 1/2 an hour prior to the start of the scheduled time to report the situation. Also, if possible, report when he plans to return to work. If he does not know when he will be able to return it will be necessary to call <u>EACH</u> day until it is established as to the exact day and time of the employee's return, and in no case should this be less than one hour before the start of his

---

[2] Brakhahn testified that Merrell was Refinery Superintendent. Def. App. at 59. Schoonover's deposition and employment records indicate that Merrell was Feedhouse Superintendent and Schroeder was Refinery Superintendent. Def. App. at 9-10 & 41-43. Christine Helle also testified that Merrell was Feedhouse Superintendent. Pl. App. at 51.

shift. When possible an employee should notify the plant at least 8 hours prior to his absence from work or his return to work. In the case of illness a doctor['s] release to return to work may be required. The number to call to report your absence is 398-0640.

## II. TARDINESS

A. An employee should call the plant, in advance, if he knows he is going to be late. Failure to call the plant within 15 minutes following the start of his shift may result in the employee's job being filled and may deprive the employee of the opportunity to work his shift and result in appropriate disciplinary action. Avoid absenteeism and tardiness. Absenteeism and tardiness or failure to call the plant in advance of such absenteeism or tardiness may result in progressive disciplinary action up to and including discharge.

B. If for any reason an employee has not punched in and is a "No-Call/No-Show" he may be subject to disciplinary action up to and including discharge.

\* \* \*

NOTE: The above regulations covering work procedures are not to be all inclusive; reasonable rules may be established, modified, or discontinued as the need arises.

Def. App. at 38, 40 (emphasis in original). Schoonover understood the Policy.

### C. ADM Hires Schoonover

In October of 1999, ADM hired Schoonover to work at the Plant. Schoonover worked the "B shift," i.e., from 3:00 p.m. to 11:00 p.m., five days a week. The days varied from week to week, i.e., Schoonover did not have a standard Monday-to-Friday workweek. Schoonover worked the "B shift" for approximately four years in the feedhouse and two years in the refinery.

## D. Early Formal and Informal Discipline[3]

In January of 2000, Schoonover overslept and had a "No-Call/No-Show." In March of 2002, Schoonover missed work on account of a workplace injury but failed to follow the Policy's call-in procedure, i.e., properly "call off." ADM "counseled" Schoonover for these violations of the Policy. Def. App. at 8-9. ADM reminded Schoonover that it was important that she follow the Policy.

In April of 2002, Schroeder told Schoonover that her attendance record was "terrible." Def. App. at 41.[4] Schoonover "agreed that she ha[d] not done well . . . and [would] work at [it] a lot harder." *Id.* In her deposition, Schoonover conceded that her attendance was, in fact, "terrible" at the time. *Id.* at 9.

In June of 2002, Merrell "talked to [Schoonover] about [her] attendance . . . [and] stated that her [absenteeism] rate of 12.6[%[5]] [was] not acceptable and need[ed] to be

---

[3] Schoonover argues that most of her pre-June of 2004 employment history is irrelevant to the disposition of the Motion. Because the court shall deny the Motion, it need not address this argument.

[4] It is unclear how many times Schoonover missed work prior to April of 2002.

[5] Brakhahn and Helle repeatedly disclaim any knowledge of how ADM calculated its absenteeism rates. However, computer printouts in the record make clear that the rates were calculated in a relatively straightforward manner. To calculate the absenteeism rate as of a particular date, ADM first figured out the number of hours of absences the employee had in the previous twelve calendar months. Then, ADM determined the number of hours the employee was scheduled to work during the same time period, i.e., the number of hours actually worked plus the number of hours of absences. It finally divided the number of hours of absences by the number of scheduled hours. *See, e.g.*, Pl. App. at 62 (calculating a 15.33% absenteeism rate as of January 26, 2003, based upon 332.00 hours of absences and 1,833.40 hours worked in the prior year); *id.* at 63 (calculating a 15.01% absenteeism rate as of July 31, 2005, based upon 337.35 hours of absences and 1,909.50 hours worked in the prior year). When calculating the number of hours of absences, ADM counted so-called "excused absences"; the rate included hours missed due to on-the-job injuries, *see, e.g.*, Pl. App. at 62 (counting absences coded as

(continued...)

turned around [immediately]." *Id.* at 42. Merrell stated that he "fully expect[ed] her to report to work whenever she is scheduled" and "[i]f this attendance does not turn around <u>now</u> we will be forced into disciplinary action." *Id.* (emphasis in original). In her deposition, Schoonover conceded that her attendance was, in fact, a "problem" at the time. *Id.* at 10.

In September of 2002, Merrell gave Schoonover a "written warning" that her attendance needed to improve. *Id.* at 43. Merrell informed Schoonover that her absenteeism rate had risen from "12.6%" to "13.6%." *Id.* Merrell told Schoonover that, if her attendance did not improve, "the next step will be a major [warning] letter." *Id.* Schoonover told Merrell that most of her absences were the result of caring for her sick brother in Waterloo, Iowa.

Schoonover's brother was in and out of the hospital and was undergoing chemotherapy treatments. Although Schoonover's mother and ex-sister-in-law also helped care for Schoonover's brother, Schoonover was responsible for watching over him immediately after his chemotherapy treatments, holding him while he was vomiting, keeping him hydrated and taking him to various appointments.

Christensen later provided Schoonover with information about the FMLA. Schoonover requested FMLA leave for the time spent caring for her brother. ADM denied Schoonover's FMLA request because her brother's "treatment . . . was too intermittent to be continuous." Def. App. at 14.

In November of 2002, Brakhahn and Merrell talked with Schoonover about a recent

---

[5](…continued)
"ON JOB INJURY") (emphasis in original), and illnesses for which the employee had a doctor's excuse, *see, e.g., id.* at 63 (counting absences labeled "ILL. DOC. EX[.]") (emphasis in original).

on-the-job injury[6] and her attendance.  After discussing the injury, the following colloquy took place:

> [Brakhahn]:  I looked at your file and your record sucks.

> * * *

> [Merrell]:  [Your absenteeism rate] was at 13.62[%], now it is at 13.65[%] and that's not including the other lost time, which probably puts you at [a] 14% absenteeism [rate].

> [Brakhahn]:  Is your absenteeism work related?

> [Schoonover]:  My [adult] brother is dying of cancer, he is in remission now, but they aren't sure when it will come back and he lives in Waterloo. . . . He's had a lot of close calls.

> * * *

> [Brakhahn]:  The big picture is attendance, you hurting your hands, and neither is getting better.

> [Merrell]: . . . June, September, November it's getting worse.

> [Schoonover]:  I know.  Outside of my injuries, the call-offs are for my brother.

> * * *

> [Merrell]:  . . . . Illness—12.5 days.  Illness in family—2 days.  Personal business—6.5 days.  On job injury—4 days. Off-job injury—10 days.  This is not going the right way.

> * * *

> [Brakhahn]:  I'm a compassionate person and I give people a lot of rope.  But there's only so much I can give.  . . . . I'm

---

[6] Schoonover had chipped her finger bone.

> not ready for termination, but I'm ready for benchmarks. . . .
> We need a plan of action; this needs to be more structured
> . . . . Goals can suck. They are a bit of a challenge. People
> need to know their expectations . . . . If your absenteeism
> doesn't improve, you will be spending even less time here
> . . . . The plant average is around 1.8[%] and you are
> bringing the average way up. When did your [d]octor say you
> could return?
>
> [Schoonover]: The [d]octor wants me off a week.

*Id.* at 46-48. Brakhahn granted Schoonover time off to recover from her recent injury and ordered her to "set some goals for herself" and provide him "a timeline for improving [her] attendance. . . ." *Id.* at 49. However, ADM did not take any formal disciplinary action against Schoonover.

While she was off work, Schoonover devised a plan for improving her attendance. She "tried to have other family members help [her] brother more than [she did] and tried to stay at work more and keep [her] mind off him more." *Id.* at 13. Because Schoonover worked the "B shift" and lived within an hour's drive of her brother, she was able to care for him until 1:30 p.m. on workdays. Further, by December of 2002, her brother's health started to improve.

### E. Plan

On December 9, 2002, Brakhahn notified Schoonover that her absenteeism rate had risen to 14.46% as of November 17, 2002. Brakhahn ordered Schoonover to lower her absenteeism rate to "[a]t or below the plant absenteeism rate." *Id.* at 50. Brakhahn put Schoonover on a formal attendance improvement plan ("Plan"). The Plan provided as follows:

> For the next six months [i.e., until May 16, 2003]. . . : Miss
> one time with a [d]octor's excuse. Miss 2 times with or
> without a [d]octor's excuse you will receive a major warning
> letter, miss 3 times with or without a [d]octor's excuse you

13

> will receive a last chance letter, miss 4 times and you will be
> terminated.  We will meet again in May to see where we are
> and reevaluate this [P]lan.

*Id.* at 50; *accord id.* at 51 (letter memorializing meeting).

On December 25, 2002, and January 1, 2003, Schoonover called off work.
Schoonover called the wrong telephone number when calling off work on January 1, 2003.
Schoonover's reasons for these absences are unknown.

On January 3, 2003, Brakhahn issued a "major warning letter" to Schoonover.  *Id.*
at 52.  Brakhahn noted that Schoonover had missed two days of work and failed to follow
the Policy on one occasion.  Brakhahn concluded the letter as follows:

> As stated in [the Plan], the second call-off has resulted in a
> major warning letter, of which you are receiving today.  The
> next call-off we receive from you (number three), as stated in
> the [Plan], will result in a last chance letter.

*Id.*

On March 1, 2003, Schoonover was ill and called off work.  Schoonover had a
doctor's excuse for her absence and provided it to ADM.

On March 3, 2003, Brakhahn issued a "last chance letter" to Schoonover.  *Id.* at
53.  After reiterating the terms of the Plan, Brakhahn stated:

> Since December 9[,] 2002, you have called off three
> times. . . .  As stated in [the Plan] the third call-off has
> resulted in a last chance letter, of which you are receiving
> today.  The next call-off we receive from you . . . will result
> in termination.

*Id.*

There is no evidence in the record that Schoonover had any more absences while
the Plan was in effect.  The Plan expired without incident on May 16, 2003.

### F.  Revised Plan

On June 10, 2003, Brakhahn issued a revised attendance improvement plan

("Revised Plan") to Schoonover. Brakhahn stated:

> As of today . . . your absenteeism rate has fallen to approximately 7%, which is a great improvement. We would like to continue to see your absenteeism rate decline and have updated the [Plan] to reflect this. If you miss no additional time in the next 6 months (June 2003 - November 2003), your absenteeism rate will be approximately 3%. If you miss one day in the next 6 months (June 2003 - November 2003), your absenteeism rate will be approximately 3.2%. Although both 3% and 3.2% are higher than the [P]lant average of approximately 1.57%, achieving those rates will be another positive step toward reducing your existing absenteeism rate of 7%. Therefore, in the next 6 months (June 2003 - November 2003) we will allow you to call off one time with a [d]octor's excuse and it will be excused. The second time you call off in the next six months will result in a written warning for absenteeism, the third time you call off in the next six months will result in a major warning letter, the fourth time you call of in the next six months will result in a last chance letter, and the fifth time you call off in the next six months will result in termination. We will meet again in November 2003 to re-evaluate your absenteeism and [the Revised Plan].

> You have made great progress in reducing your absenteeism rate and it is our hope that together we can continue to bring your absenteeism rate down to a more acceptable percentage.

*Id*. at 54. It appears that the Revised Plan expired without incident in November of 2003.

### G. Late 2003 and Early 2004 Absences

In December of 2003, Schoonover called off six days, because she had bronchitis. ADM treated these six absences as FMLA-protected.

On February 7 and 8, 2004, Schoonover called off work, because she was ill. On March 10, 2004, Schoonover called off work, because her mother was admitted to a hospital. On March 14, 2004, Schoonover called off work, because of an off-the-job injury. On March 28, 2004, Schoonover called off work, because she had a water leak

in her home. On April 4 and 5, 2004, Schoonover called off work, because she was ill. On April 11, 2004, Schoonover called off work for unspecified reasons.

Schoonover did not work from April 21, 2004 to May 11, 2004, because she was suffering from migraine headaches. It is unclear whether Schoonover called off each day that she was scheduled to work until she knew the precise date of her return or ADM waived such portion of the Policy.

On April 26, 2004, Schoonover applied for FMLA leave for her migraine-headache-related absences. ADM approved Schoonover's application and designated her migrane-headache-related absences as FMLA-protected.

On June 6, 2004, Schoonover called off work, because she was ill.

### H. 2004 Last Chance Agreement

On June 8, 2004, Klostermann issued Schoonover a "last chance letter" ("2004 Last Chance Agreement"). *Id.* at 56. The letter stated:

> [Y]ou will be allowed one excused absence between now and December 6, 2004. This absence not only has to meet your criteria for excused, it must meet that of Keith Klostermann and Doug Brakhahn. Your record will be reviewed in six months (December 7, 2004).
>
> Any unexcused absence before December 6, 2004 will result in termination of your employment at ADM.

*Id.* Klostermann did not consider Schoonover's FMLA-protected, bronchitis-related and migraine-headache-related absences when issuing the 2004 Last Chance Agreement.

Plaintiff did not work from September 27, 2004, to November 3, 2004, because of an injury to her back. ADM did not count these absences against the terms of the 2004 Last Chance Agreement, because they were FMLA-protected. The terms of the 2004 Last Chance Agreement apparently expired without incident on December 7, 2004.

## I. *Final Plan*

On February 9, 2005, February 12, 2005, and April 9, 2005, Schoonover called off work, because she was ill. On June 4, 2005, and July 2, 2005, Schoonover called off work, because of off-the-job injuries.

Schoonover missed work from July 21, 2005, to August 1, 2005, because of an infected sweat gland in her arm pit and subsequent surgery. The infected sweat gland caused a large lump that made it very difficult for Schoonover to move her arm without suffering pain in her back, shoulder, arm and side. These absences were FMLA-protected.

On August 4, 2005, Schoonover left work early because she was ill and then called off on August 5, 2005. On August 22, 2005, Plaintiff also called off work, because she was ill.

On August 31, 2005, Merrell implemented a final attendance improvement plan ("Final Plan") for Schoonover after receiving Brakhahn's approval. Merrell wrote:

> Over the course of your employment at ADM, you have been counseled on absenteeism/tardiness on several occasions. In addition, you have been given one [m]ajor [w]arning [l]etter, [the Plan, the Revised Plan], and three [l]ast [c]hance [a]greements; all in an effort to improve your attendance.
>
> Today your absenteeism rate is at 15.01%.[7] This is not acceptable and shows the course of action taken in the past as mentioned above is not working. . . . It is [ADM]'s desire to offer you one final chance to improve your attendance. If

_____

[7] This rate includes Schoonover's FMLA-protected absences in July of 2005. *See* Pl. App. at 63. ADM was enforcing an illegal no-fault attendance policy. *See* 29 C.F.R. § 825.220(c); *see, e.g., Thorson v. Gemini, Inc.*, 123 F.3d 1140 (8th Cir. 1997) ("The Department of Labor's regulations implementing the FMLA forbid an employer from counting FMLA leave time under 'no-fault' attendance policies."); *see also Darby*, 287 F.3d at 680 (reversing, in part, grant of summary judgment to employer, where employee received an "Incident Report" that "specifically listed 'unpaid leave' as a problem").

there is a breach of this [Final Plan], your employment with
ADM will be terminated.  The [Final Plan] is as follows:

You will be allowed to call off one time in the next six months
(September 1, 2005—February 1, 2006) with a [d]octor's
excuse and it will be excused.  The second time you call off in
the next six months (with or without a [d]octor's excuse) may
result in termination.  We will meet again in February [of]
2006 to re-evaluate your absenteeism and the attendance
improvement plan.

*Id.* at 57.

### J.  Digestive Problems

In November of 2005, Schoonover became ill with digestive problems.  She had
severe stomach cramps, diarrhea, gassiness and constipation.  Schoonover's back hurt and
her legs were numb.  She was often unable to get out bed, unable to eat and had difficulty
drinking water.  At times, she was reduced to tears on account of the severity of the pain
and could barely move.  Schoonover has a history of digestive problems, including
infectious diarrhea, and has undergone surgery on her colon in the past.

On November 7, 2005, Schoonover called off work, because of her digestive
problems.

On November 8, 2005, Schoonover went to an urgent care clinic.  Nurses at the
clinic told Schoonover to go to the emergency room at a hospital.  At the hospital, a doctor
saw Schoonover.  Although the doctor subjected Schoonover to a variety of tests, he could
not identify the cause of her problems.  The doctor told Schoonover to follow up with her
primary-care physician, Dr. Ronald Dose, within 24 to 48 hours.  Schoonover was not
scheduled to work until November 11, 2005, so she scheduled an appointment with Dr.
Dose for November 10, 2005.  Then, on November 8, 2005, after she saw the emergency
room doctor, Schoonover called off work again.  Further, Schoonover told Helle or Nehre
that she would not return to work until she was able to meet with Dr. Dose.

On November 10, 2005, Schoonover met with Dr. Dose. Dr. Dose observed tenderness in the right lower quadrant of Schoonover's abdomen but could not diagnose the cause of her digestive problems. Dr. Dose referred Schoonover to a specialist in gastroenterology, Dr. Dean Abrahamson. Dr. Dose then set up an appointment for Schoonover with Dr. Abrahamson for November 15, 2005. Dr. Dose did not immediately place any restrictions upon Schoonover's ability to work, because he was waiting for certain test results and to see if the appointment with Dr. Abrahamson could be moved up.

On November 11, 2005, Dr. Dose issued a work release to Schoonover. This first work release stated that Schoonover should not work on November 11, 2005. Schoonover then called off work for November 11, 2005. Schoonover also personally informed Helle of the work release.

On November 12, 2005, Schoonover returned to the emergency room, because of her digestive problems. Schoonover saw a doctor, who conducted further tests but could not diagnose the cause of her digestive problems. On the same date, Schoonover called off work for both November 12 and 13, 2005. Although Paragraph I of the Policy required Schoonover to call off each day until she knew the precise date of her return, Helle permitted employees to call off for multiple days "[i]f they know they're going to be off for an extended period of time." Def. App. at 124. Helle's practice is consistent with the "NOTE" to the Policy, which allows ADM to relax the Policy's requirements.

On November 13 to 17, 2005 and November 19 to 21, 2005, Schoonover called off work each day, because of her digestive problems. Schoonover was not scheduled to work on November 18, 2005.

On November 15, 2005, Schoonover met with Dr. Abrahamson. Dr. Abrahamson prescribed a laxative and scheduled a colonoscopy for November 28, 2005. Dr. Abrahamson did not place any restrictions on Schoonover's activities.

On November 16, 2005, Dr. Dose issued Schoonover a backdated work release that

stated that Schoonover was "unable to go to . . . work" from November 10, 2005, through November 16, 2005. Pl. App. at 70.[8] Schoonover immediately told Nehre that she had received this second work release from Dr. Dose. Schoonover did not physically provide such release to ADM. Nehre told Schoonover that Schoonover should "just bring it in when [Schoonover] came back to work." Def. App. at 32.

On November 18, 2005, one of Helle's subordinates, Linda Gaines, forwarded Schoonover paperwork for certifying her digestive-problem-related absences under the FMLA. Gaines told Schoonover that she had until December 9, 2005 to complete such paperwork.

On November 19, 2005, Schoonover called off for November 19 and 20, 2005. Also on November 19, 2005, Schoonover attended a previously scheduled anniversary party for her mother and stepfather in Waterloo. A friend drove Schoonover to the party, and Schoonover stayed for approximately two hours. Schoonover did not eat at the party and only drank two or three glasses of water. Schoonover's parents had "shaky" health and she "didn't know how much longer . . . either one of them would be around." Pl. App. at 33. On November 21, 2005, Schoonover called off work.

From November 22 through November 25, Schoonover was absent from her scheduled shifts and did not call off work. On November 21 or 22, 2005, Schoonover called Dr. Dose's office. She told a nurse that her digestive problems were persisting and she was reduced to laying down with a heating pad on her stomach. The nurse relayed this information to Dr. Dose, who agreed that Schoonover should have another week off work. Dr. Dose issued a backdated work release to Schoonover. This third work release stated that Schoonover was "unable to go to . . . work" from November 17, 2005, through

_____

[8] This second work release thus overlapped the first work release in part.

November 25, 2005, and was "ok to return with *no restrictions*" on November 28, 2005.[9] Pl. App. at 69 (emphasis in original). Consistent with Nehre's prior instructions, Schoonover did not physically provide the third work release to ADM.[10] Rather, Schoonover told Nehre or Helle about the third work release.[11] Nehre told Schoonover that Schoonover did not need to call in for the next week, because Schoonover "was still under [Dr. Dose's] care." Def. App. at 32.

On November 28, 2005, Dr. Abrahamson performed a colonoscopy on Schoonover. Abrahamson did not find any abnormalities in Schoonover's colon but issued an additional prescription.

### K. Stepfather's Heart Attack

On November 29, 2005, Helle called Schoonover. Helle wanted to know whether Schoonover would be returning to work on November 30, 2005. Schoonover told Helle that Schoonover was going to ask Dr. Dose to excuse her from work through December 5, 2005. Schoonover also stated:[12]

---

[9] Schoonover was not scheduled to work on November 26 through 29, 2005.

[10] On November 23, 2005, one of Schoonover's friends picked up this third work release from Dr. Dose's office on Schoonover's behalf.

[11] Schoonover testified that she could not remember whether she spoke with Nehre or Helle on November 21 or 22, 2005. On direct examination, Helle testified that she did not learn about the third work release until months after ADM fired Schoonover. On cross-examination, Helle admitted that she does not remember. Helle also testified that ADM never trained her on the FMLA.

[12] Helle gives a different account of the nature and timing of her conversation with Schoonover about Schoonover's stepfather. Helle did not mention any discussion of Schoonover's stepfather in the November 29, 2005 phone conversation. Helle testified that Schoonover left messages about her stepfather sometime after Helle's shift on November 30, 2005, but before her shift began on the morning of December 1, 2005. *See, e.g.,* Def. App. at 126.

21

> I believe that my stepfather had a heart attack[.]  I'm on my
> way to Waterloo right now as we speak.  . . . . I will need
> more FMLA.

Def. App. at 32.  Helle told Schoonover to "go take care of [her] family."  *Id.*
Schoonover considered her stepfather to be her "dad," because he had raised her "for over
30 years."  Pl. App. at 27.

While in Waterloo, Schoonover gave emotional and moral support to her mother
and other family members.  Schoonover stayed almost exclusively at the hospital with her
unconscious stepfather[13] and approximately twenty other family members.  Schoonover's
digestive problems had allieviated somewhat, allowing her to travel to Waterloo, but she
still did not feel well enough to work.

On November 29 or 30, 2005, Helle called Dr. Dose's office and Dr.
Abrahamson's office.  Helle inquired at each office as to whether Schoonover had
extended her work release to December 5, 2005.  Each office denied that any such
extension had been granted.[14]

On November 30, 2005, Schoonover called off work.  Schoonover called Helle
directly instead of using the number listed in the Policy, because Helle had called
Schoonover directly the previous day.

At some point in time, Schoonover asked Dr. Dose to excuse her from work from

---

[13] Schoonover's stepfather remained unconscious until his death in February of
2006.

[14] Helle testified that Dr. Dose's office indicated that Dr. Dose had "released
[Schoonover] from his care on November 16, 2005."  Def. App. at 125.  Dr.
Abrahamson's office simply stated that "it was a one-day procedure only, November 28[,]
2005."  *Id.*  The court notes that the Eighth Circuit Court of Appeals has stated that an
employer is prohibited "from directly contacting an employee's doctor."  *Hite v. Vermeer
Mfg. Co.*, 446 F.3d 858, 863 n.2 (8th Cir. 2006).  The parties do not raise this potential
issue.

November 28, 2005, through December 5, 2005. Dr. Dose refused to issue a fourth work release.

## L. Termination

On December 1, 2005, Schoonover called Helle to let her know that she would not be able to work for two more days on account of her stepfather. Schoonover testified:

> I . . . called [Helle] from the hospital and she said that my job position was terminated, and I said, you know, why. And she said a violation of the [Final Plan]. And I'm like, how is that possible? I was on FMLA. And she's like, well, that's what we . . . decided, your job position was terminated.

Def. App. at 30. The same date, Helle sent Schoonover the following letter:

> This letter will formally notify you that your employment with ADM has been terminated as a result of a breach of the [Final Plan] signed by you in August [of] 2005. Please contact me to arrange a time to pick up your personal items from your locker and turn in your employment badge.

Pl. App. at 59.

Brakhahn testified that he made the decision to terminate Schoonover's employment. He stated:

> On December 1, 2005, [Helle] informed me of [Schoonover's] absences in the month of November; the fact that [Helle] had been informed that [Schoonover] had been released to return to work after November 16, 2005; [Schoonover's] failure to call the [P]lant on four consecutive days she was scheduled to work; and, her additional absences after her doctor excused her to return to work.

> Based upon Ms. Schoonover's long record of poor attendance and her violation of the [P]olicy by failing to report her November 22, 23, 24 and 25 absences, I decided to terminate [Schoonover's] employment on December 1, 2005. . . . ADM treated Schoonover's absences from November 7-16, 2005 as protected under the FMLA.

23

> I did not consider Schoonover's FMLA protected absences when I made the decision to terminate Schoonover's employment. I would terminate any employee who failed to call off work when missing four consecutive shifts without a valid excuse. . . .

Def. App. at 61 (paragraph numbers omitted). Brakhahn testified that, even though the Final Plan stated that Schoonover had an "unacceptable" absenteeism rate of "15.01%," Def. App. at 57, he did not consider such rate in deciding whether to issue the Final Plan. Specifically, Brakhahn testified:

> [T]he rate was not the reason for the implementation of the [Final] Plan. There are no required criteria for implementation of a plan. The decision is based on individual circumstances and attendance trends.

Def. App. at 60. Helle explained under oath that, even though the Final Plan stated that Schoonover had an "unacceptable" absenteeism rate of "15.01%," Def. App. at 57, ADM did not consider such rate in deciding whether to issue the Final Plan. She testified:

> [The Final Plan] was based on a history of attendance issues that she has had. The statement of it being 15.01[%] was more of an awareness, this is what it is today. . . . But when we looked at her overall history and saw the pattern of continued attendance issues and some more call-offs taking place, that was the basis of [the Final Plan].

Pl. App. at 51.

In its answer to interrogatories, ADM offered different reasons for terminating Schoonover. ADM stated:

> [Schoonover]'s discharge was based on [her] long history of tardiness and absenteeism which resulted in [the Final Plan] and [her] breach of [the Final Plan] when she failed to properly notify [ADM] of absences from work on November 21 to November 25, 2005 and November 30, 2005, in violation of [the Policy]. [Schoonover] was also terminated

due to her failure to submit documentation requested on November 18 confirming that absences for November 8 through her date of discharge qualified under the FMLA and therefore did not violate her [Final Plan], pursuant to [ADM]'s FMLA policies and procedures.

Pl. App. at 58.

## VI. ANALYSIS

### A. Elements of Schoonover's Two Claims

To establish her interference claim under 29 U.S.C. § 2615(a)(1), Schoonover must prove five elements: (1) Schoonover was an "[e]ligible employee," 29 U.S.C. § 2611(2); (2) ADM was an "[e]mployer," 29 U.S.C. § 2611(4); (3) Schoonover was entitled to FMLA leave, 29 U.S.C. § 2612(a)(1); (4) Schoonover gave ADM notice of her intent to take FMLA leave, 29 U.S.C. § 2612(e)(1); and (5) ADM denied Schoonover FMLA benefits to which she was entitled. *Wysong*, 503 F.3d at 447 (citing *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)); *see, e.g., Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (same); *Roberts v. Ground Handling, Inc.*, 499 F. Supp. 2d 340, 351 (S.D.N.Y. 2007) (same); *Belgrave v. City of N.Y.*, No. 95-CV-1507 (JG), 1999 WL 692034, *43 (E.D.N.Y. Aug. 31, 1999) (same), *aff'd*, 216 F.3d 1071 (2d Cir. 2000). "[N]o finding of ill intent is required." *Burnett*, 472 F.3d at 477; *see also Stallings*, 447 F.3d at 1050 ("[A]n employee can prove interference with an FMLA right regardless of the employer's intent."). To prove her retaliation claim under 29 U.S.C. § 2615(a)(2), Schoonover must also prove retaliatory intent on the part of ADM. *See Stallings*, 447 F.3d at 1050 ("The difference between [an interference claim and a retaliation claim] is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent."); *see also Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (applying the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973), to a FMLA-retaliation claim).

In its Motion, ADM challenges Schoonover's ability to prove (1) Schoonover was entitled to FMLA leave and (2) Schoonover gave ADM notice of her intent to take FMLA leave. The court considers these two arguments, in turn. The court assumes that, for purposes of the Motion, ADM concedes the remaining elements of Schoonover's claims.[15]

### B. Was Schoonover Entitled to FMLA leave?

An employee is entitled to FMLA leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employee is also entitled to leave under the FMLA "[i]n order to care for the . . . parent . . . of the employee, if such . . . parent has a serious health condition." *Id.* § 2612(a)(1)(C). Schoonover argues that she was entitled to FMLA leave for her absences in November and December of 2005, because (1) she had digestive problems and (2) her stepfather had a heart attack. ADM denies that Schoonover was entitled to leave under the FMLA for either category of absences. The court considers the two categories of absences, in turn.

### 1. Digestive problems

ADM argues that Schoonover is not entitled to leave under the FMLA for her absences related to her digestive problems in November of 2005. To prove she is entitled to leave for such absences, Schoonover must prove "(1) [she was] afflicted with a 'serious health condition' and (2) that condition render[ed] [her] unable to perform the functions of [her] job." *Burnett*, 472 F.3d at 477-78 (citing 29 U.S.C. § 2612(a)(1)(D)).

ADM apparently does not dispute that Schoonover's digestive problems were a "serious health condition." 29 U.S.C. § 2612(a)(1)(c); *see, e.g., Thorson v. Gemini, Inc.*, 205 F.3d 370, 374-81 (8th Cir. 2000) (holding that digestive problems, including an upset

_____

[15] ADM expressly concedes that Schoonover is an eligible employee and ADM is a covered employer. Brief in Support of Motion (docket no. 14-2), at 14 n.1.

stomach and diarrhea, constituted a "serious health condition").[16] Further, ADM does not directly dispute that Schoonover's digestive problems made her "unable to perform the functions of [her] position . . . ." *Id.* Rather, ADM posits that "[n]o health care provider made such a determination here," Brief in Support of Motion (docket no. 14-2), at 18, and thus dismissal of the Complaint is appropriate. ADM cites a hodgepodge of non-binding district court cases that reflect the prevailing view that "a plaintiff's own statement is generally insufficient to establish incapacity under the FMLA." *McClure v. Comair, Inc.*, No. Civ. A. 04-107-DLB, 2005 WL 1705739, at *6 (E.D. Ky. July 20, 2005); *see also Joslin v. Rockwell Int'l Corp.*, 8 F. Supp. 2d 1158, 1160 (N.D. Iowa 1998) (Jarvey, M.J.) (same); *Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1167-68 (N.D. Ohio 1997) (same); *Bell v. Jewel Food Store*, 83 F. Supp. 2d 951, 959 (N.D. Ill. 2000) (same); *Levine v. Children's Museum of Indianapolis, Inc.*, No. IP 00-0715-C G/H, 2002 WL 1800254, at *6 (same), *aff'd*, 61 F.App'x 298 (7th Cir. 2003).

The principal problem with ADM's argument is that Schoonover has presented the court with evidence—other than her own testimony—to support her claim that she was unable to work due to her digestive problems in November of 2005. The cited district court cases are thus distinguishable. In *Joslin*, for example, the district court noted that "[t]he only testimony in the record suggesting that the plaintiff was unable to work was from the plaintiff herself." 8 F. Supp. 2d at 1160. The plaintiff in *Joslin* "was never professionally assessed" and "never saw a health care provider." *Id.* at 1161. The district court thus held that summary judgment was appropriate, because the plaintiff's own testimony was "not enough to prove incapacity." *Id.* at 1160. Unlike the plaintiff in *Joslin*, Schoonover saw multiple health care providers (Dr. Dose, Dr. Abrahamson, and

---

[16] As relevant here, "[t]he term 'serious health condition' means an illness, injury, impairment, or physical . . . condition that involves . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11); *see also* 29 C.F.R. § 825.114(a) (construing "serious health condition").

an emergency room doctor) and her primary health care provider, Dr. Dose, excused her absences no less than three times. *Compare Rankin v. Seagate Techs., Inc.*, 246 F.3d 1145, 1148-49 (8th Cir. 2001) (holding that employee created a genuine issue of material fact as to whether she was incapacitated based upon her own testimony and "medical records that showed that she claimed that she had been suffering from the same symptoms [of fatigue and sleeplessness]") *and Cook v. Electrolux Home Prods.*, No. C04-3063-MWB, 2005 U.S. Dist. LEXIS 29828, *31 n.5 (N.D. Iowa  Nov. 28, 2005) (holding that plaintiff created a genuine issue of material fact as to whether she was incapacitated based upon health care providers' determination that she was suffering from a "disability"), *aff'd*, 416 F.3d 848 (8th Cir. 2005), *with Frazier v. Ia. Beef Processors*, 200 F.3d 1190, 1195 (8th Cir. 2000) (holding the record contained insufficient evidence of incapacity, where the plaintiff's doctors never told him he was unable to perform his job, prescribed medication or put him on a program of treatment or a course of physical therapy) *and Martyszenko v. Safeway, Inc.*, 120 F.3d 120, 123 (8th Cir. 1997) (holding the record contained insufficient evidence of incapacity, where a doctor "did not restrict any of [his patient's] daily activities.").   The second and third work releases expressly state that Schoonover was "unable to go to . . . work."  Pl. App. at 69-70.  Schoonover is only required to show that she was unable to perform her job; she does not have to show that she was totally incapacitated.  *Stekloff v. St. John's Mercy Health Servs.*, 218 F.3d 858, 861 (8th Cir. 2000).

This case is similar in many respects to *Thorson v. Gemini, Inc.*, 998 F. Supp. 1034 (N.D. Iowa 1998) (Melloy, C.J.), *aff'd*, 205 F.3d 370 (8th Cir. 1999).  In *Thorson*, the plaintiff suffered from digestive problems.  998 F. Supp. at 1035.  A doctor treated the plaintiff and ordered her not to return to work.  *Id.*  The defendant then fired her for excessive absenteeism.  *Id.*

In the district court, the defendant argued that, despite the doctor's work release,

the plaintiff could have returned to work. *Id.* at 1037-38. The defendant presented the district court with after-acquired evidence that the plaintiff was, in fact, able to work. *Id.* The district court rejected the defendant's argument. *Id.* at 1038. The district court held that the defendant's argument was "unreasonable," because "[w]hen a doctor tells a person to stay at home from work, the employee is justified in believing that she should not return to work . . . ." *Id.* The district court held that the work release was sufficient evidence of inability to work and granted the plaintiff's partial motion for summary judgment on the issue of liability. *Id.* at 1039.

The Eighth Circuit Court of Appeals affirmed in relevant part. *Thorson*, 205 F.3d at 381-82. The Eighth Circuit Court of Appeals held that the defendant could not "show, with its evaluations made long after the fact, that there remains a genuine issue of material fact on the question of [the plaintiff's] capacity to perform her job." *Id.* at 382. The Eighth Circuit Court of Appeals pointed out that, if a defendant wishes to challenge the propriety of a doctor's work release, it must avail itself of the FMLA's certification process, 29 U.S.C. § 2613, not summarily terminate the plaintiff first and ask questions later. *Thorson*, 205 F.3d at 381.

Just like the plaintiff in *Thorson*, Schoonover was justified in believing that she should not return to work when Dr. Dose released her from work. 205 F.3d at 381-82. ADM, which summarily fired Schoonover instead of allowing her the opportunity to complete the FMLA's certification process, cannot now challenge the propriety of Dr. Dose's work releases.[17] *Thorson*, 205 F.3d at 382; *see also Spangler v. Fed. Home Loan*

_____

[17] The court notes that, unlike the defendant in *Thorson*, ADM has not presented the court with any *evidence* that Schoonover was able to work in November of 2005. ADM launches a wholly unsubstantiated attack on Dr. Dose's professionalism, ethics and medical judgment.

ADM opines that "Plaintiff, with the willing assistance of her physician's office, subverted the purpose of the FMLA." Brief in Support of Motion (docket no. 14-2), at

(continued...)

*Bank*, 278 F.3d 847, 853 (8th Cir. 2002) (reversing grant of summary judgment as to FMLA claim, where there was evidence that the employer "summarily dismissed [the plaintiff] instead of either providing her with FMLA leave or following the FMLA's certification procedure"). Accordingly, the court holds that, for summary judgment purposes, Schoonover has shown that she was entitled to leave under the FMLA for her absences related to her digestive problems in November of 2005.

### 2. Stepfather's heart attack

ADM argues that Schoonover is not entitled to leave under the FMLA for her absences related to her stepfather's heart attack, *i.e.*, her absences on November 30, 2005, and December 1, 2005. To prove she is entitled to leave for such absences, Schoonover must prove she was absent (1) in order to care for (2) one of her parents (3) who had a

---

[17](...continued)

21. ADM points out that Dr. Dose (1) did not immediately place any restrictions on Schoonover's ability to work and (2) allowed his nurse to talk to Schoonover on the telephone, relay Schoonover's concerns and stamp his signature on the work release forms with approval. ADM also points out that none of the other doctors who examined Schoonover in November of 2005 placed any restrictions upon her ability to work. Therefore, ADM concludes that Dr. Dose's three work releases thus "amount[] to a junior high 'hall pass'" and opines that Schoonover's "absences expose an all too common flaw in the system in which employees unilaterally decide their days off and have doctor's offices write notes excusing their absences without even evaluating the patient's condition or considering the impact on the employer." *Id.* at 18.

There is no evidence in the record that Dr. Dose departed from standard medical practice when he issued the work releases. To the contrary, every indication in the record is that Dr. Dose only issued the work releases based upon his informed opinion and solely in view of Schoonover's best medical interests. It is immaterial that Dr. Dose did not directly speak with Schoonover immediately prior to issuing the work releases. Dr. Dose had personally treated Schoonover in the not too distant past; Schoonover was suffering from the same or substantially similar symptoms throughout the time period in question; and, prior to issuing the work releases, Dr. Dose spoke with his nurse and directed her to issue them. In any event, ADM does not cite any precedential cases that hold that Dr. Dose's practices require dismissal of Schoonover's FMLA claims.

serious health condition. 29 U.S.C. § 2612(a)(1)(C).

ADM does not dispute the second and third elements; ADM apparently concedes that Schoonover's stepfather was her "parent" and had a "serious health condition." Rather, ADM challenges the first element. ADM opines that Schoonover's presence at her stepfather's bedside was not necessary, because she had other relatives at the hospital "to address the situation." Brief in Support of Motion (docket no. 14-2), at 21. ADM points out that Schoonover "was not needed to provide care such as medical, hygenic or nutritional needs or safety." *Id.* ADM opines that "Plaintiff's stepfather was not conscious . . . , so her presence was not needed to provide psychological comfort or assurance to him." *Id.*

In support of its argument for dismissal, ADM cites only one case, *Tellis v. Alaska Airlines, Inc.*, 414 F.3d 1045 (9th Cir. 2005). ADM cites *Tellis* for the proposition that "caring for a family member with a serious health condition involves some level of participation in ongoing treatment of that condition." 414 F.3d at 1047 (citation and internal quotation marks omitted). *Tellis*, of course, is not binding upon this court.

Schoonover rejoins that, while the FMLA does not define the phrase "[i]n order to care for," the Department of Labor's regulations implementing the FMLA state that the phrase should be read broadly to include both physical and psychological care. 29 C.F.R. § 825.116(a). The phrase "also includes situations where the employee may be needed to fill in for others who are caring for the family member, or to make arrangements for changes in care . . . ." *Id.* § 825.116(b). Schoonover argues that *Tellis* is distinguishable, because she was physically present at her stepfather's bedside.

The court agrees with Schoonover that *Tellis* is distinguishable. In *Tellis*, the plaintiff's wife was having difficulties with her pregnancy and his vehicle broke down in Seattle, Washington. 414 F.3d at 1046. He owned another vehicle in Atlanta, Georgia, and decided to fly there to pick up the vehicle and drive it back to Seattle. *Id.* While the

plaintiff was driving back to Seattle (a four-day trip), he regularly called his wife on the telephone to see how she was doing. *Id.*

The Ninth Circuit Court of Appeals rejected the plaintiff's claim that his cross-country trip and phone calls should be considered "caring for" his wife under the FMLA. *Id.* at 1048. The Ninth Circuit Court of Appeals observed that "[c]ourts in this Circuit and other jurisdictions that have concluded a particular activity has constituted 'caring for' a family member under the FMLA have done so only when the employee has been in close and continuing proximity to the ill family member." *Id.* at 1047. Because the plaintiff left his wife instead of staying with her, the Ninth Circuit Court of Appeals upheld dismissal of his FMLA claim. *Id.* at 1048.

Unlike the plaintiff in *Tellis*, Schoonover left work to stand vigil at her stepfather's bedside. Thus, the holding of *Tellis* is inapplicable here. In the absence of any on-point legal authority, the court declines to dismiss Schoonover's lawsuit. *See* LR 7.d (requiring citations to authorities).

The court recognizes that the FMLA does not protect mere visitation. *See, e.g., Fioto v. Manhattan Woods Golf Enters., LLC*, 123 F.App'x 26, 28 (2d Cir. 2005) (affirming district court's decision to grant judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), where the plaintiff presented insufficient evidence that he was absent from work to care for his mother in the hospital while she underwent emergency brain surgery), *aff'g* 270 F. Supp. 2d 401, 406 (S.D.N.Y. 2003). That said, Schoonover has provided the court with sufficient evidence from which a jury could find that, while she was absent from work, she was providing her stepfather with the requisite level of psychological care. *See, e.g., Bell v. Prefix, Inc.*, No. 05-74311, 2007 WL 2109569, at *4 (E.D. Mich. July 23, 2007) (characterizing as "untenable" the defendant's argument that the plaintiff was not providing psychological care to her unconscious father, because, "[t]aken to its logical conclusion, [d]efendant's argument would leave the FMLA

without an allowance for psychological care if the loved one was unable to visibly react to it").[18]

Accordingly, the court holds that a reasonable jury could find that Schoonover was entitled to leave under the FMLA for her absences related to her stepfather's heart attack, *i.e.*, her absences on November 30, 2005, and December 1, 2005.

### C. Did Schoonover Give ADM Notice of Her Intent to Take FMLA Leave?

The FMLA requires that employees give not less than thirty days' notice to employers in the event of foreseeable leave. 29 U.S.C. § 2612(e)(1). When the leave is unforeseeable, employees must give notice "'as soon as practicable.'" *Carter v. Ford Motor Co.*, 121 F.3d 1146, 1148 (8th Cir. 1997) (quoting 29 C.F.R. § 825.303). Leave may be unforeseeable when the employee suffers a medical emergency, suffers an abrupt change in circumstances or does not know approximately when the leave will begin. *Spangler*, 278 F.3d at 852 (citing 29 C.F.R. § 825.302(a)). "As soon as practicable means 'as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case.'" *Woods*, 409 F.3d at 991 (quoting 29 C.F.R. § 825.302(b)). "Generally, this means no more than two days after learning of the need for the leave." *Carter*, 121 F.3d at 1148 (citing 29 C.F.R. § 825.303).

The FMLA's notice requirement is far from onerous. The Eighth Circuit Court of Appeals recently stated:

> [It is] very easy for [a plaintiff] to give notice of her intent to take leave. She is not required to understand when she may take FMLA leave, or to state explicitly that she intends to take FMLA leave, or, indeed, even to know that the FMLA exists.

___

[18] Although one would ordinarily expect Schoonover's mother to make the arrangements for her husband's physical care, Schoonover's mother was also in poor health. Schoonover's mother had open heart surgery in September of 2005. Schoonover testified she was responsible for her mother, who had a "tough time" recovering and whose health was "shaky." Def. App. at 4.

> All she has to do is apprise her employer of the specifics of
> her health condition in a way that makes it reasonably plain
> that it is serious and tell her employer that this is why she will
> be absent. Her employer would then have the duty to
> investigate whether she is entitled to FMLA leave.

*Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 473 (8th Cir. 2007).

"Although the employee need not name the statute, *Thorson*, 205 F.3d at 381, he must provide information to suggest that his health condition could be serious." *Woods*, 409 F.3d at 990 (citing *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1009 (7th Cir. 2001)). "Employees thus have an 'affirmative duty to indicate both the need and the reason for the leave,' and must let employers know when they anticipate returning to their position." *Id.* (quoting *Sanders v. May Dep't Stores Co.*, 315 F.3d 940, 944 (8th Cir. 2003)). Employees may give notice to employers in person or by telephone, facsimile or email. 29 C.F.R. § 825.303(a).

"An employer may also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave." 29 C.F.R. § 825.302(d). "For example, an employer may require that written notice set forth the reasons for the requested leave, the anticipated duration of the leave, and the anticipated start of the leave." *Id.* "However, failure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice." *Id.* "An employer may waive employees' FMLA notice requirements." *Id.* § 825.302(g).

ADM argues that Schoonover failed to comply with its usual and customary notice requirements for requesting leave. ADM states that Schoonover "inexplicably failed to inform ADM that she would be absent from November 22, 23, 24 and 25, 2002 [sic]." Brief in Support of Motion (docket no. 14-2), at 16. Brakhahn testified that he fired Schoonover in part because she failed to follow the Policy and "would terminate any

34

employee who failed to call off work when missing four consecutive shifts without a valid excuse." Def. App. at 61. ADM points out that "[t]he FMLA simply does not force an employer to retain an employee on FMLA leave when the employer would not have retained the employee had the employee not been on FMLA leave." *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005).

The court shall assume without deciding that any failure on Schoonover's part to follow the Policy would justify her termination. *Compare Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 878 (10th Cir. 2004) (holding that employee's failure to follow attendance policy justified termination and dismissal of FMLA interference claim) *and Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706-709-10 (7th Cir. 2002) (same), *with* 29 U.S.C. § 825.302(d) ("[F]ailure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice."). Even so, a reasonable jury could find that Schoonover complied with the Policy or ADM waived it. *See* 29 C.F.R. § 825.302(g) ("An employer may waive employees' FMLA notice requirements."). Although Schoonover initially gave inconsistent testimony at her deposition, *see* Def. App. at 26 & 28, she later testified that on November 21 or 22, 2005: (1) she told Nehre or Helle about the third work release and (2) Nehre told Schoonover that Schoonover did not need to call in for the week of August 22, 2005, because Schoonover "was still under [Dr. Dose's] care." Def. App. at 32.[19]

---

[19] Schoonover also submitted an affidavit to the court with her Resistance. In the affidavit, she states: "consistent with my past practice, and upon my belief, I would have reported [the third work] release to ADM as soon as I knew that Dr. Dose was going to give it to me." Pl. App. at 1. ADM objects to this affidavit testimony as an impermissible attempt to contradict her deposition testimony. *See, e.g., Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1363-65 (8th Cir. 1983) (holding that an affidavit that is inconsistent with prior deposition testimony generally cannot create a genuine issue of material fact). Because the court does not rely on this statement, it need not consider ADM's objection.

Viewing the record in the light most favorable to the nonmoving party and affording her all reasonable inferences, *Baer Gallery*, 450 F.3d at 820, a jury could find that Schoonover complied with the call-in requirement of the Policy until ADM waived it. Indeed, ADM had arguably waived the call-in requirements of the Policy twice before, in April of 2004 and in early November of 2005. The Policy itself permitted such waivers when circumstances warranted.

Accordingly, the court holds that a reasonable jury could find that Schoonover gave ADM proper notice of her intention to take FMLA leave.

## VII.  DISPOSITION

The Motion (docket no. 14) is **DENIED**. This matter shall proceed to trial on both claims as scheduled.

**IT IS SO ORDERED.**

**DATED** this 31st day of January, 2008.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA